**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ABBOTT LABORATORIES, | ECF Case |
| Plaintiff, | Consolidated Case No. 18-cv-8468 (LGS) |
| - against - | |
| NANCY FEINBERG, HOPE FEINBERG SCHROY AND DAVID FEINBERG, AS CO-EXECUTORS FOR THE ESTATE OF CAROL J. FEINBERG, | |
| Defendants. | |
| NANCY FEINBERG, HOPE FEINBERG SCHROY AND DAVID FEINBERG, AS CO-EXECUTORS FOR THE ESTATE OF CAROL J. FEINBERG, | Related Former Case No. 19-cv-600 (LGS) |
| Plaintiffs, | |
| - against - | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

## DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

PRYOR CASHMAN LLP
   William L. Charron
   Kaveri Arora
7 Times Square
New York, New York 10036
(212) 421-4100

*Attorneys for Defendants/Related Former Case-Plaintiffs Nancy Feinberg, Hope Feinberg Schroy and David Feinberg, as Co-Executors for the Estate of Carol J. Feinberg*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

    Duncan/CAA Was An Art Merchant ............................................................. 1

    Kaufman/Sibelius Was A Good Faith Buyer Of The Painting In The Ordinary Course ......... 3

ARGUMENT ....................................................................................................... 4

  I.    ABBOTT'S REPLEVIN CLAIM IS BARRED
        BY FEINBERG'S DEFENSE OF ENTRUSTMENT ................................. 4

    A.    Duncan/CAA Was An Art Merchant ................................................ 4

        1.    Abbott Viewed Duncan And CAA Were Indistinguishable ........... 4

        2.    Duncan/CAA Regularly Dealt In Art ...................................... 7

    B.    Kaufman/Sibelius Was A Buyer In The Ordinary Course ................. 8

        1.    Kaufman/Sibelius Was Not A Merchant
             With a Heightened Duty Of Diligence ..................................... 9

        2.    Kaufman Conducted Good Faith
             Diligence Even Under A Heightened Standard .......................... 11

            a.    There Were No "Red Flags"
                Concerning The Painting's Provenance ............................. 12

                i.    Evans Did Not Tell Kaufman That
                      Duncan Did Not Own The Painting ........................... 12

                ii.  There Were No Red Flags Concerning H.V. Allison ........ 14

            b.    There Was No Red Flag Concerning The Painting's Price .......... 15

            c.    Duncan's Transport Of The Painting
                Without A Fram Was Not A Red Flag ............................. 16

            d.    Evans's Partial Indemnity Does Not
                Reflect Kaufman's Awareness Of Red Flags ................... 17

i

**TABLE OF CONTENTS,** *continued*

e.   Abbott's Contention That Kaufman Should Have
Reviewed The ███████ Papers Is Disingenuous.........................17

3.   Kaufman's Good Faith Is Further Evidenced
By His Reporting Of Duncan To The FBI In 1991 ...................19

CONCLUSION................................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                                        **PAGE(s)**

*Brown v. Mitchell-Innes & Nash, Inc.*,
   No. 06 Civ. 7871 (PAC), 2009 WL 1108526 (S.D.N.Y. Apr. 24, 2009)..................................4

*Levin v. Gallery 63 Antiques Corp.*,
   No. 04 CV 1504 KMK, 2006 WL 2802008(S.D.N.Y. Sept. 28, 2006)..................................11

*MAFG Art Fund, LLC v. Gagosian*,
   123 A.D.3d 458 (1st Dep't 2014)..................................................................................10

*Overton v. Art Fin. Partners LLC*,
   166 F. Supp. 3d 388 (S.D.N.Y. 2016) ........................................................... 4, 9, 11

*Porter v. Wertz*,
   53 N.Y.2d 696 (1981)..................................................................................................6

*Zuckerman v. Metropolitan Museum of Art*,
   928 F.3d 186 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1269 (2020)......................................2, 7

**FEDERAL RULES & REGULATIONS**

Fed. R. Civ. P. 30(b)(6)..........................................................................................2, 5, 8

Fed. R. Evid. 602 ..................................................................................................19

Fed. R. Evid. 801(d)(2) .........................................................................................5

Fed. R. Evid. 802 ..................................................................................................19

Fed. R. Evid. 805 ..................................................................................................19

**N.Y. U.C.C.**

N.Y.U.C.C. § 1-201(9)............................................................................................11

N.Y.U.C.C. § 2-104(1)............................................................................................4,10

N.Y.U.C.C. § 2-403(2)............................................................................................ 1, 20

**TREATISE**

Gary D. Sesser, *Provenance: Important, Yes, But Often Incomplete and Often Enough, Wrong.*
   *What Consequence for a Sale?,* 4 Spencer's Art Law Journal 1, 2 (Spring 2013) ..............15

**ARTICLE**

Oscar Holland, *Rare Da Vinci painting smashes world records with $450 million sale*, CNN Styles,
   Updated Nov. 16, 2017, https://www.cnn.com/style/article/da-vinci-salvator-mundi-sale-
   christies/index.html .........................................................................................16

iii

Defendants/related former case-plaintiffs Nancy Feinberg, Hope Feinberg Schroy and David Feinberg, as Co-Executors for the Estate of Carol J. Feinberg (collectively, "Feinberg") respectfully submit this pre-trial memorandum of law in advance of the trial in the consolidated matters of *Abbott Laboratories v. Feinberg*, Consolidated Case No. 18-cv-8468 (LGS), and *Feinberg v. Abbott Laboratories*, Related Former Case No. 19-cv-600 (LGS) (collectively, the "Action"), which is scheduled to commence on October 26, 2020 against plaintiff/related former case-defendant Abbott Laboratories ("Abbott").

Feinberg submits this pre-trial memorandum of law solely with respect to the defense of entrustment under N.Y. U.C.C. § 2-403(2).

## PRELIMINARY STATEMENT

The law puts the burden on entrustors of property, such as Abbott, to know the parties with which they are dealing. The law likewise puts the risk of loss on a party like Abbott if its chosen entrustee is a "merchant" that sells the property to a good faith "buyer in the ordinary course." That is what happened here.

Feinberg's entrustment defense should bar Abbott's replevin claim because, when Abbott allegedly entrusted the Painting at issue to Bruce Duncan ("Duncan") and Chicago Appraisers Association ("CAA") in 1987, Abbott understood that it was dealing with an art merchant. When Duncan/CAA sold the Painting to Eric Kaufman ("Kaufman") through his Sibelius Corporation ("Sibelius"), title passed because Kaufman/Sibelius was a buyer in the ordinary course. Because Feinberg's title is derivative of that transaction, Feinberg has good title to the Painting as a matter of law.

### Duncan/CAA Was An Art Merchant

Duncan/CAA's "merchant" status is amply supported. Abbott's records establish that it understood Duncan/CAA to be a seller of goods like the Painting; indeed, Abbott specifically

1

asked Duncan/CAA to make recommendations of art to purchase for its collection, from which Abbott purchased at least one painting.  (Def. Exs. 50-53, 81, 133.)  The record also establishes that Duncan/CAA regularly sold and consigned art, including through Christie's auction house and to Wendy Hoff Evans (and, with respect to the Painting, to Sibelius).

Abbott now tries to avoid the entrustment defense by arguing that, whereas Duncan sold the Painting to Sibelius, Abbott allegedly entrusted the Painting to "CAA," not to Duncan.  The law is not that hyper-technical.  The entrustment defense is not about corporate formalities or names on doors, but how the entrusting party perceived its entrustee.  Here, the evidence establishes that Abbott viewed CAA and Duncan as one and the same.

Most significantly, when Abbott was asked during its Rule 30(b)(6) deposition to explain its solicitations and purchase of art from CAA around the same time that it was allegedly entrusting the Painting, Abbott testified repeatedly that it had "bought a piece from [CAA] *through Bruce Duncan*," that "*Bruce Duncan* was offering pieces for sale to Abbott," and that "[t]here was a piece that was purchased *from Mr. Duncan*, who was the president of CAA."  (Maritato Dep. at 174:12-15, 176:2-5, 176:25-177:13 (emphases supplied).)  Abbott understood that, when it dealt with CAA, it was dealing equally with Duncan.  Abbott also understood that Duncan/CAA was not merely a conservator and appraiser of art, but was also a merchant of art.[1]

To the extent that Feinberg is unable to further prove this point through the testimony of those Abbott executives and employees who actually dealt with Duncan/CAA in the 1980s, the laches defense should apply to bar Abbott's replevin claim.  *Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 194-95 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1269 (2020).

---

[1] Abbott was not alone in that view:  Lela Hersh (Abbott's art consultant), Wendy Evans and Eric Kaufman have all expressed their understandings that CAA was, in the testimony of Ms. Hersh, "just him [Duncan]."  (Hersh Dep. 70:19-71:8.)  As also previously explained in Feinberg's Proposed Findings, Duncan and CAA shared a common address, and Duncan was the only registered agent of CAA.  (Def.'s Prop. Findings at ¶ 341.)

**Kaufman/Sibelius Was A Good Faith Buyer Of The Painting In The Ordinary Course**

Abbott alternatively tries to avoid Feinberg's entrustment defense by arguing that Kaufman/Sibelius did not purchase the Painting from Duncan in good faith.  But Abbott's primary support is an antagonistic and leading deposition that it conducted of Kaufman, which *avoided* asking lines of questions that would have enabled Kaufman to fully explain the events that Abbott now places at issue.  Kaufman will testify at the trial in this Action (and thus his deposition is inadmissible hearsay); that will be the first time that Kaufman will have an opportunity to testify without any unreasonable constraint from Abbott.  In the meantime, Feinberg explains below how Abbott has egregiously mischaracterized Kaufman's activities.

In accusing Kaufman of bad faith, Abbott has also avoided dealing with an obviously significant fact:  Kaufman personally reported Duncan to the FBI in the 1990s, after he first had cause to question whether Duncan may have been selling his client, Wendy Evans, fake art.  If Kaufman had suspected Duncan of criminal activity in 1987, as Abbott now asserts, then the *last* thing Kaufman would have done would have been to report Duncan to the FBI.  (The FBI acted on Kaufman's tip in the 1990s, investigated and interviewed Duncan, and found *no basis* to prosecute him.  (Def. Ex. 162.).)

Feinberg is confident that the Court will find Kaufman – who is an attorney with esteemed credentials and who would have had no reason to risk his livelihood and reputation in the way that Abbott now tries disingenuously to confect – to be a credible witness and to have been a good faith buyer of the Painting in the ordinary course.  Abbott's replevin claim, accordingly, should be barred by Feinberg's entrustment defense.

**ARGUMENT**

**II.    ABBOTT'S REPLEVIN CLAIM IS BARRED
        BY FEINBERG'S DEFENSE OF ENTRUSTMENT**

As explained in Feinberg's Proposed Findings of Fact and Conclusions of Law, the "theory

behind the UCC's entrustment provision is that a person who knowingly delivers his property to a

merchant dealing in goods of that kind 'assumes the risk of the merchant's acting unscrupulously

by selling the property to an innocent purchaser.'" *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06

Civ. 7871 (PAC), 2009 WL 1108526, at *4 (S.D.N.Y. Apr. 24, 2009) (citation omitted); *accord

Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 399 (S.D.N.Y. 2016) (the entrustment

provision is meant to "enhance the reliability of commercial sales by merchants … by shifting the

risk of resale to one who leaves his property with [a] merchant.").

The policy and elements of entrustment are satisfied in this case.

**A.     Duncan/CAA Was An Art Merchant**

The linchpin of Abbott's case is that it allegedly entrusted the Painting to Duncan/CAA in

1987, and that Duncan allegedly abused that entrustment by copying and selling the Painting later

that year.  Assuming, *arguendo*, that Abbott can show that its executives and employees entrusted

the Painting to Duncan/CAA in 1987, then the evidence also supports that Abbott understood

Duncan/CAA to be an art "merchant" at the time within the meaning of N.Y. U.C.C. § 2-104(1).

**1.     Abbott Viewed Duncan And CAA Indistinguishably**

Abbott's attempt to distinguish CAA from Duncan for the sole purpose of its entrustment

argument is disingenuous.  Abbott had first tried to avoid Feinberg's entrustment defense by

misrepresenting to this Court that it had no documents that would reflect it having ever purchased

art from Duncan/CAA.  (Def.'s Prop. Findings at ¶ 215.)  After the Court directed it to produce

whatever documents might exist, Abbott produced, *inter alia*, correspondence from Duncan/CAA

responding to a solicitation by Abbott to purchase art, an invoice on CAA letterhead for the sale

of at least one painting to Abbott, and an Abbott administrative check request payable to CAA.

(Def. Exs. 50, 53, 133.)

Feinberg asked Abbott about these documents and transactions during its Rule 30(b)(6)

deposition.  Abbott's testimony showed that it conflated Duncan with CAA:

> Q.  Isn't it a fact, CAA was offering art for sale to Abbott?
> A.  And so this is Bruce Duncan, as the president [of CAA], writing Ginger [Harwell]" from Abbott on CAA letterhead….

> ***

> Q.  Did Abbott give any consideration to Mr. Duncan's suggestions in this letter?
> A.  Well, I think eventually they [Abbott] bought a piece from Duncan.

> ***

> Q.  Right.  But it's on CAA letterhead, correct?
> A.  It is on CAA letterhead.
> Q.  CAA was in fact offering art for sale to Abbott, correct?
> A.  We – Bruce Duncan was offering pieces for sale to Abbott, and he was the president of CAA.
> Q.  Abbott in fact bought art from CAA, correct?
> A.  There was a piece that was purchased from Mr. Duncan, who was the president of CAA, ….

> ***

> Q.  Does this reflect that Abbott Laboratories purchased a work of art from CAA for $2,027.65?
> A.  And so this would indicate that this is an invoice to Abbott in the amount of $2,227 [sic]….  But working with Bruce Duncan, who had – as previously shown – pieces, if there was something someone was looking for and it fit that – clearly we bought a piece from Chicago Art Appraisers [sic] through Bruce Duncan…. And we did buy a piece from him, from Bruce Duncan, but the work we were [buying] was through the Chicago Appraisers Association.

(Maritato Dep. at 172:4-173:2, 174:12-15, 176:2-5, 176:25-177:13, 182:13-184:5.)

These are party admissions.  Fed. R. Evid. 801(d)(2).  Regardless of formalities such as

letterheads and invoices, Abbott viewed Duncan and CAA interchangeably, and Abbott also

understood Duncan/CAA to be a seller of art.  Abbott's understanding was consistent with the understanding of Ms. Hersh, who testified that CAA was "just" Duncan.  (Hersh Dep. 70:19-71:8.) Wendy Hoff Evans likewise could not distinguish between Duncan and CAA in testifying that she "met Bruce [Duncan] at Christie's" where "[h]e was consigning art" as "a periodic consignor" either as himself or as CAA.  (Evans Dep. at 50:22-25, 122:8-13, 126:13-20; *accord* Def. Ex. 54 (allegation by Evans's former attorney, Eric Kaufman, that Evans "had been doing business with a certain Robert Bruce Duncan, directly and as Chicago Art Appraisers [sic.] (hereinafter, collectively, 'Duncan') from whom [Evans] had purchased and on whose behalf [Evans] had sold various works of art").)

Abbott's reliance in its Proposed Findings on *Porter v. Wertz*, 53 N.Y.2d 696, 699-700 (1981), is misplaced.  (Pl.'s Prop. Findings at ¶ 159.)  The plaintiff in *Porter* had purchased a painting from a delicatessen worker named Wertz.  *Id.*  The painting had been entrusted, however, to an art merchant named Von Maker, who was Wertz's friend.  *Id.*  The clear distinction between these two individuals barred the plaintiff from prevailing on an entrustment defense.  *Id.*  *Porter* did not involve a situation, as presented here, where an individual and his company are viewed indistinguishably by the entrustor.

Indeed, the decision in *Porter* makes clear that the entrustment defense could have been meritorious had the plaintiff in that case been able to prove either:  (i) that Von Maker (the art merchant) had told the plaintiff that Wertz (the deli worker) had been selling the painting on Von Maker's behalf; or (ii) that the plaintiff "reasonably assumed" Wertz to have been an art merchant. 53 N.Y.2d at 699.  The analysis is not simply whether the entrustee and the seller are identical, as Abbott suggests.  Unlike the record in *Porter*, the record in this Action – including in particular Abbott's admissions quoted above – establishes that Abbott understood CAA was operating,

6

issuing invoices and collecting money on behalf of Duncan, and that Abbott reasonably assumed it was dealing with CAA "through Duncan."

To the extent Feinberg is unable to further prove these points due to the loss of documents and the deaths of the material witnesses (including Ginger Harwell, William Pratt, Laurence Lee, Robert Schoellhorn, and Bruce Duncan), Feinberg has been unduly prejudiced from establishing an entrustment defense, which is another reason for laches to apply. *See Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 194-95 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1269 (2020) ("Nor are there first-hand witnesses who could testify to facts relevant to the Met's possible affirmative defenses, including whether [an intervening buyer] purchased the Painting in good faith" sufficient to establish an entrustment defense, thereby warranting application of laches).

### 2.     Duncan/CAA Regularly Dealt In Art

Abbott's further contention that Duncan/CAA was not "regularly engaged in buying and selling art" is incorrect. (Pl.'s Prop. Findings at ¶¶ 156-157.) Abbott disregards the evidence from Wendy Evans that Duncan/CAA "periodically" consigned art for sale through Christie's, and then continued to sell art regularly to Evans (and, with respect to the Painting, to Sibelius). (Evans Dep. at 50:22-25, 60:8-22, 65:2-9, 122:8-13.)

To the extent that Feinberg was unable to obtain additional information about this issue from Duncan through discovery in this Action, laches once again should apply. *See Zuckerman*, 928 F.3d at 194-95.

Practicing the adage that "the best defense is a good offense," Abbott attempts to blame Feinberg for not eliciting "expedited" evidence from Duncan sooner. (Pl.'s Prop. Findings at ¶ 84, 142.) This attack is a transparent attempt to deflect from Abbott's striking failure to have acted with reasonable diligence in connection with the Painting, including never *trying* to elicit evidence

from Duncan (and then turning around and testifying through its Rule 30(b)(6) deponent, Karmin Maritato, that it "was sad to hear" that Duncan had died because Abbott "was hoping that we would be able to speak with him, and I wish we would have been able to speak to him sooner"). (Maritato Dep. 302:3-9, 326:13-17.)

Abbott's criticism of Feinberg's discovery efforts is also baseless. Feinberg had sought expedited discovery in her first-filed Illinois action, but Abbott *opposed* any such discovery from occurring due to its anticipated motion to dismiss or transfer (which is something that Abbott fails to advise this Court). (N.D. Ill. ECF No. 11, filed 9/13/18, at ¶ 10 ("[T]his title dispute should be litigated in New York, and [Feinberg's] motion for expedited discovery should be denied.").) The only expedited deposition that occurred while the Illinois action was still pending (in October 2018 and on consent) was the deposition of Carol Feinberg herself due to her advanced age. The Illinois case was then transferred to this Court and consolidated with Abbott's subsequently-filed action. (S.D.N.Y. ECF No. 32 (Consolidation Order dated Feb. 28, 2019).) Feinberg subpoenaed Duncan and CAA on May 1, 2019, two and half months before the initial fact discovery deadline of July 17, 2019 (that deadline was extended to August 23, 2019). (ECF No. 61 (Scheduling Order).) Feinberg did not know at the time, and could not have predicted, that Duncan had (or would have) passed away (on April 19, 2019). (*See* Def. Ex. 137.) Abbott's assertion that Feinberg "decided not to" try to develop a record from Duncan/CAA is frivolous. (Pl.'s Prop. Findings at ¶ 142.)

### B.  Kaufman/Sibelius Was A Buyer In The Ordinary Course

Abbott's alternative attempt to defeat Feinberg's entrustment defense by attacking New York attorney and art collector Eric Kaufman is also groundless.

1. **Kaufman/Sibelius Was Not A Merchant**
   **With A Heightened Duty Of Diligence**

Abbott notes in its Proposed Findings that "a merchant purchaser may have a duty to inquire into the provenance or ownership of the merchandise being sold where there are 'warning signs' or 'red flags' indicating problems with the sale." *Overton*, 166 F. Supp. 3d at 401; Pl.'s Prop. Findings at ¶ 169.  Abbott argues that Kaufman/Sibelius was a "merchant purchaser" of the Painting in July 1987, and thus asserts that a heightened duty of diligence should have applied. (*Id.* at ¶¶ 163-166.)

Nevertheless, there is nothing in the record that shows Kaufman/Sibelius to have been regularly buying and selling art in or prior to 1987.  Sibelius was not formed until May 1987, and the record is uncontroverted that the first time Kaufman (through Sibelius or otherwise) ever acquired art for the purpose of resale was when Sibelius purchased the Painting in July 1987. (Kaufman Dep. 40:18-20, 43:4-7.)

Abbott's counsel tried repeatedly to get Wendy Evans to agree that Kaufman had been buying and selling art prior to 1987; but Evans repeatedly denied that Kaufman had done so:

Q.  Okay.  And what did he [Kaufman] advise or counsel you on?
A.  If I required an elaborate bill of sale he would help me prepare it.
Q.  And so, you understood at the time that Eric Kaufman acted as counsel in art transactions, right?
A.  Yes.

***

Q.  Okay.  You didn't barter with him?
A.  No.
Q.  And you knew that he was a collector as well?
A.  Yes.
Q.  And that he bought and sold art for himself?
A.  I mostly knew him as a collector?
Q.  You didn't know him to sell art, as well?
A.  Not particularly, No.

*** 

Q.  But, you knew at some points in – over the – over the time you knew him that he was selling art, as well, for investment purposes, right?
A.  No.

*** 

Q.  Right.  Okay.  So, you did know Eric Kaufman to be involved in the purchase and sale of art….
A.  I disagree with your characterization.
Q.  Okay.  Tell me why.
A.  He was – I knew him as an investor.  Period.

(Evans Dep. 16:10-17, 18:10-23:25.)

Abbott's reliance on *MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458, 459 (1st Dep't 2014), for the proposition that an art transactional lawyer or investor may be a "merchant" under U.C.C. § 2-104(1), is misplaced.  (Pl.'s Prop. Findings at ¶ 166.)  *MAFG* had nothing to do with the questions of "merchant" or "buyer in the ordinary course" status.  The court in that case found that the defendant did not "exercise[] control and dominance over plaintiffs" sufficient to find a fiduciary relationship between them, and thus the sophisticated plaintiffs were responsible for their own diligence into an artwork's value.  123 A.D.3d at 459 (citation omitted).  The court did not concern itself with the question of what the plaintiffs' level of diligence should have been under the U.C.C., which is the question that Abbott has raised here.

Abbott also contends that a higher diligence standard that would have applied to Evans if she had been the purchaser of the Painting (as an art dealer) should be imputed to Kaufman/Sibelius as well.  (Pl.'s Prop. Findings at ¶¶ 167-168.)  But Evans was *not* the buyer of the Painting, nor, according to her, did she "help Eric Kaufman sell that work to make a profit on that deal."  (Evans Dep. at 25:9-26:9.)

10

Abbott's reliance on *Levin v. Gallery 63 Antiques Corp.*, No. 04 CV 1504 KMK, 2006 WL 2802008, at *9 (S.D.N.Y. Sept. 28, 2006), to try to attach Evans's diligence duty to Kaufman/ Sibelius, is misplaced.  (Pl.'s Prop. Findings at ¶ 168.)  *Levin* did not concern the "merchant" or "buyer in the ordinary course" diligence standards under the U.C.C.  The court in *Levin* found that a buyer of antiques could not justifiably rely on fraudulently inflated appraisals where the buyer was aided by an antiques specialist who specifically cautioned that the appraisals were "overvalued."  2006 WL 2802008, at *9.  *Levin* had nothing to do with the question of whether a buyer acted in "good faith" and with "honesty in fact" under the U.C.C., which, again, is the question presented here.  *See* N.Y. U.C.C. § 1-201(9).[2]

Furthermore, unlike the situation in *Levin*, there is no evidence that Evans cautioned Kaufman/Sibelius to avoid the Painting or Duncan.  On the contrary, Evans testified that "[t]here was no reason … to think there was anything wrong with Bruce Duncan," and she did not "have any reason to believe that Mr. Duncan did not have the right to transfer good title to the ▮▮▮ work".  (Evans Dep. at 50:23-25, 122:21-123:2.)  Kaufman/Sibelius's good faith in purchasing the Painting is thus *confirmed by*, not impeached by, Evans's input.

### 2.  Kaufman Conducted Good Faith Diligence Even Under A Heightened Standard

Abbott does not offer any law as to whether a heightened diligence standard applied to merchants in 1987, or what such a standard would have entailed.  Abbott's case law is considerably more recent and based upon contemporary technological means to conduct "diligent inquiry as to the provenance of the work in question" more readily and reasonably (*e.g.*, through the Internet). *See, e.g.*, *Overton*, 166 F. Supp. 3d at 401.

---

[2] Although *Levin* does support that Kaufman's reliance on Evans to provide him with information about the Painting was entirely appropriate.

Even if one were to assume, *arguendo*, that Kaufman/Sibelius had some heightened duty of diligence in 1987, that standard was met in connection with the Painting.  As set forth in Feinberg's Proposed Findings, Kaufman was referred to Duncan by Evans, who was an art dealer and client whom Kaufman knew and trusted; Kaufman met with Duncan, whom he understood from Evans had dealt with her both at Christie's and directly; Evans provided Kaufman with information she had obtained from the ███ Papers at the Archives of American Art reflecting the Painting's history; Kaufman contacted IFAR (which was the primary, generally accessible source of information at the time concerning fake and stolen art) and inquired about both the Painting and Duncan; and Kaufman contacted a gallery ("H.V. Allison") that he was told had once sold the Painting.  (Defs.' Prop. Findings at ¶¶ 220-228, 345-355.)  Indisputably, these good faith diligence efforts would have met any standard applicable even to merchants at the time of Sibelius's purchase.

### a.      There Were No "Red Flags" Concerning The Painting's Provenance

Abbott's criticisms that Kaufman should have gone further in his diligence based upon supposed "red flags" from the diligence described above are baseless.

### i.      Evans Did Not Tell Kaufman That Duncan Did Not Own The Painting

Abbott claims that Kaufman was presented with supposedly conflicting stories from Duncan and from Evans as to who owned the Painting in July 1987.  (Pl.'s Prop. Findings at ¶ 173.)  Specifically, Duncan told Kaufman that he had acquired the Painting "from a woman or family … who had acquired it from the H.V. Allison Gallery in New York many years earlier." (Kaufman Dep. 31:23-32:15.)  Evans did not have any specific recollections of saying something different to Kaufman, but she recalled Duncan telling her that he "was representing the owner,"

12

and she claimed that she would have told Kaufman anything that Duncan had said to her.  (Evans Dep. 92:15-93:14.)

Abbott did not share Evans's testimony on this subject with Kaufman during his deposition, choosing instead (over objections) to allow him to see only a small excerpted portion of her transcript on a different matter.  (Kaufman Dep. 92:4-14.)  Nor did Abbott ask Kaufman to address any supposed inconsistent accounts as between Evans and Duncan.  Kaufman will be able to address this issue for the first time during the trial.

Feinberg's understanding is that Kaufman will testify that Evans did *not* report to him that Duncan had claimed not to own the Painting or to be representing another owner; Kaufman would have had no reason to proceed with the deal with Duncan if he had understood there was another owner.  And Evans would have had no reason to sit silently while Kaufman/Sibelius purchased the Painting from Duncan, if she had understood that Duncan did not own the Painting to sell (Evans's so-called "finder's fee" was contingent on Sibelius successfully reselling the Painting).

Evans repeatedly testified during her deposition that her recollections, 33 years after the fact, were faded or gone.  (Evans Dep. 36:6-8 ("I don't know…. It's a long time ago."), 37:11-13 ("It's a long time ago.  I – no.  I don't think so – no.  Maybe.  No.  I don't think so."), 46:20-24 ("I mean, I kind of blocked it.  No.  I – there was – there was other stuff.  I don't know.  I don't remember….  It's 30 years ago."), 71:4-6 ("That rings a bell….  It was some 30 years ago.").)  Evans did not tell Kaufman anything that was inconsistent from what Duncan had told him.  Notably, while Abbott initially represented that it would be calling Evans to testify at the trial, (8/20/20 Hrg. Tr. at 3:24-4:1), it is not doing so and is choosing instead to designate her (unreliable) deposition testimony as an unavailable witness.

### ii.   There Were No Red Flags Concerning H.V. Allison

Abbott also claims that the H.V. Allison gallery told Kaufman that it "had no records of the Painting," which supposedly should have been a red flag to Kaufman.  (Pl.'s Prop. Findings at ¶ 174.)  This assertion is a half-truth.  What Kaufman actually recorded is that "Allison reported that their records for the period were scant but that they did handle some ███████ consistent with their concentration in handling Bentons." (Def. Ex. 97.)  Kaufman explained during his deposition:

> So I contacted the Allison Gallery by telephone and asked him – I told them that there was a painting which was claimed to have been sold by them some three years earlier.  They said it could be.  They didn't have records going back anywhere that far, but it was entirely possible being consistent with their dealing American Modernist paintings ....

(Kaufman Dep. 33:6-15.)

H.V. Allison did not tell Kaufman that it never possessed the Painting, as Abbott misleadingly implies.  H.V. Allison told Kaufman that it was "entirely possible" it *did* once have the Painting.

Abbott further claims that Duncan "completely remov[ed]" H.V. Allison and Duncan from the Painting's provenance.  (Pl.'s Prop. Findings at ¶¶ 178-179.)  This assertion is false.  Abbott relies on Kaufman's deposition testimony concerning an insurance valuation that was *prepared by Evans*.  (Kaufman Dep. 163:2-4, 166:16-19, 168:13-169:3; Pl. Ex. 39.)  Kaufman testified that the provenance identified by Evans on that valuation was unremarkable to him at the time.  (*Id.*)  Kaufman did not prepare such documents and he did not understand them to require any more complete information; as he explained, the document was "an insurance valuation; it's not an academic article."  (*Id.*)

Kaufman also explained that "[i]t was my understanding that provenance did not always list everybody whoever owned a work of art," and "I understood [provenance] to mean a record of

prior ownership, not necessarily exhaustive.  Could be, might not be." (*Id.* at 168:13-20.)
Kaufman's understanding was (and still is) consistent with art market custom and practice. *See*
Gary D. Sesser, *Provenance: Important, Yes, But Often Incomplete and Often Enough, Wrong.*
*What Consequence for a Sale?,* 4 Spencer's Art Law Journal 1, 2 (Spring 2013).  It was in that
context that Kaufman testified he was satisfied with Evans's valuation document because it
identified the Painting's historical provenance according to information in the ██████ Papers,
which he understood to be "the things of relevance" for a valuation like this. (*Id.* at 167:19-169:11.)

Kaufman also explained that he did not consider adding H.V. Allison to the known
provenance because H.V. Allison could not confirm that fact due to the passage of time, even
though they told him it was "entirely possible" they did. (*Id.* at 163:23-165:11.)  Indeed, H.V.
Allison may have merely had the Painting on consignment or for exhibition, but not as an owner.
Kaufman also explained that Evans's "Private Collection Chicago" entry seemed perfectly
adequate and unremarkable to him, particularly for an insurance valuation. (*Id.* at 166:20-169:11.)

b.       **There Was No Red Flag Concerning The Painting's Price**

Abbott additionally claims that "Kaufman knew that he was purchasing the Painting at a
sale price obviously below market" and at "'a bargain basement price'". (Pl.'s Prop. Findings at
¶ 175.)  This assertion is also false.  As Feinberg's Proposed Findings set forth, Abbott's own
independent appraisers had valued the Painting *below* the $85,000 purchase price that Sibelius
paid around the same time period. (Defs.' Prop. Findings at ¶¶ 219, 353.)  Furthermore, Evans
told Kaufman that Christie's had valued the Painting between $50,000-70,000 before Sibelius
purchased it. (Kaufman Dep. 31:7-18.)

Kaufman's ability to resell the Painting in January 1988 to Berry-Hill Galleries for
$250,000 reflects nothing more than a sale to a particularly eager buyer in a highly idiosyncratic

market.[3]  (Another potential buyer had rejected Kaufman's similar price a few months earlier, claiming that such a price was "perhaps double" what he thought the Painting was worth.  (Def. Ex. 163.))  Furthermore, Kaufman had structured the sale to Berry-Hill so that it acquired the Painting in or about November 1987 upon a promissory note to pay in January 1988, giving Berry-Hill two months to find its own buyer and not have to go out of pocket to pay Sibelius anything. (Def. Ex. 164.)

Kaufman viewed the Painting as an investment opportunity, and he intended to resell it at a profit.  It would be unreasonable to conclude that Kaufman must have believed the Painting was stolen because he had adopted that investment strategy.[4]

### c.    Duncan's Transport Of The Painting Without A Frame Was Not A Red Flag

Abbott's further claim that Kaufman/Sibelius's purchase of the Painting without a frame should have stood out to him as "unusual for an artwork like this" is absurd.  (Pl.'s Prop. Findings at ¶ 176.)  Abbott has offered no custom and practice evidence to support this claim.  Nor is there anything remotely suspicious about a dealer choosing to transport a painting unframed and in a portfolio rather than in a frame at greater difficulty and higher cost; this is why portfolios exist. (*See* Evans Dep. 60:11-22, 105:4-24 ("So, it might come unframed.  I didn't think much of it unless I thought the frame was important.").)

---

[3] *See, e.g.*, Oscar Holland, *Rare Da Vinci painting smashes world records with $450 million sale*, CNN Styles, Updated Nov. 16, 2017, https://www.cnn.com/style/article/da-vinci-salvator-mundi-sale-christies/index.html (reporting on sale of purported Leonardo Da Vinci painting for $450.3 million, surpassing initial valuation estimate of around $100 million).

[4] Abbott's suggestion that Kaufman may have bought the Painting in bad faith because he later asked potential buyers to maintain their negotiations in confidence and to coordinate any further diligence with him, is baseless.  (Pl.'s Prop. Findings at ¶ 185.)  Again, Abbott's counsel did not ask Kaufman about this during his deposition.  Feinberg's understanding is that Kaufman will testify that his objective was to bring a 'fresh' work to the market, and to prevent it from being 'shopped' by over-exposure among the relatively small niche of major collectors and dealers of American art at the time.  (*See also* Evans Dep. at 107:23-24 ("B[e]rry Hill had sort of bought it on spec to make a splash with.").)

In any event, even though this was another matter that Evans could not specifically recall, (*id.*), Kaufman explained that he and Evans had a particular frame in mind that they wanted to use for the Painting's resale efforts.  (Kaufman Dep. at 65:3-18, 239:12-23.)

### d.   Evans's Partial Indemnity Does Not Reflect Kaufman's Awareness Of Red Flags

Abbott's suggestion that Kaufman "forged" Evans's signature to a May 24, 1988 partial indemnity in exchange for her $80,000 share of the net profits from Sibelius's sale of the Painting to Berry-Hill is unfounded and outrageous.  (Pl.'s Prop. Findings at ¶ 180.)  Abbott's counsel did not show this document to Kaufman during his deposition.  Feinberg's understanding is that Kaufman will testify that he and Evans had historically shared profits, but their transactions had typically been in the range of only $5,000-10,000.  Because this transaction was of considerably higher value, Kaufman and Evans started memorializing their sharing of rewards and risks equally, which was repeated by them thereafter.  (*See* Def. Ex. 54.)

Evans's lack of recollection of this document reflects only her fallible memory.  Abbott's suggestion that Kaufman, a respected lawyer, may have forged Evans's signature to this document (or to anything) is utterly irresponsible.

### e.   Abbott's Contention That Kaufman Should Have Reviewed The ▮▮▮▮▮ Papers Is Disingenuous

There is an irony to Abbott's criticism that Kaufman, who was given information from the ▮▮▮▮ Papers, should have also located and reviewed the Elizabeth ▮▮▮▮ Papers.  (Pl.'s Prop. Findings at ¶¶ 181-184.)  Abbott reviewed (and produced in this case) only excerpts from the ▮▮▮▮ Papers, without also reviewing (or producing) excerpts from the ▮▮▮ Papers. This is evidence of unawareness or oversight, not of bad faith.

Information from the ███ Papers was presented to Kaufman by Evans (although Evans again could not recall the same).  (Evans Dep. 91:11-92:3 ("Q: What, if any, research did you do regarding the possible sale of the ███?  A: I can't even possibly remember.  I didn't have it very long.  Q: Okay.  At the time, whether in connection with the ███ or otherwise, did you consult with the American Archives of Art [sic.] as a resource on – on your diligence?  A: I don't know.").)  Kaufman had not known of the Archives of American Art or of the ███ Papers at the time.  Evans, who was an art dealer and American art specialist, found and shared with Kaufman information about the Painting from the ███ Papers that she had obtained.[5]

There is no reason to conclude that Kaufman – who, unlike Evans, was not an art dealer or a specialist in American art – should have gone to the Smithsonian himself in 1987 to see if he could find anything concerning the Painting, or to have doubted the reliability of the information presented to him that came from the ███ Papers.  There was no Internet or easy online access to review such files at the time.  Once again, Abbott has offered no authority for its apparent proposition that the standard of "reasonable" and "good faith" diligence in 1987 should be measured by 21st-Century technology and capabilities.

Furthermore, while Abbott points to a handwritten margin note (in disparate handwriting from other notes on the same page) in one of the ███ Papers that says, "Abbot [sic.] Lab," as "proof" of Abbott's ownership of the Painting, that note is entirely unexplained.  This note may have meant only that Abbott was thought to possess the Painting at some point, not that Abbott held title to the Painting (including, most particularly, in 1987).  It is unknown who wrote this note

---

[5] Feinberg's Proposed Findings ¶¶ 227 and 351 mistakenly state that Kaufman had seen the ███ Papers for himself.  That was a misreading of the record by Feinberg's counsel.  Kaufman had been told information by Evans that came from the ███ Papers, but Kaufman never saw the ███ Papers or had any idea of who ███ was.  Kaufman will testify to all of these matters at the trial.

or why.  Indeed, another handwritten note on the same page – in the apparent same handwriting – simply says: "Why".  (Def. Ex. 38.)[6]

There is no reason to conclude that Kaufman should have searched for the ███████ Papers, nor is there reason to conclude that the ███████ Papers would have put Kaufman on notice of a possible theft.  Abbott's further insistence that Kaufman should have searched for a *"draft"* catalogue raisonné that was archived in Washington, D.C. for *over 20 years* without ever being published – particularly where Kaufman and Evans had no concerns about the Painting's authenticity – before buying the Painting is divorced from commercial reality and reasonableness. (Evans Dep. 69:4-17.)

### 3. Kaufman's Good Faith Is Further Evidenced By His Reporting Of Duncan To The FBI In 1991

As discussed above, Abbott has thoroughly mischaracterized the record concerning Kaufman's purchase of the Painting in 1987.  Abbott has also gone out of its way to avoid addressing one of the most obvious facts that reflects Kaufman's good faith and honesty in fact: he personally reported Duncan to the FBI in or about 1991, after he learned from Evans that Duncan may have sold her fake drawings (in transactions that did not include Kaufman/Sibelius). (Kaufman Dep. 60:24-64:3, 69:15-76:23; Def. Ex. 162.)  Kaufman would not have done that if he had suspected Duncan of criminal activity in 1987; Kaufman would have effectively been reporting himself.  What this evidence shows is that, when Evans and Kaufman were first presented with some reason to doubt Duncan's *bona fides*, they acted.  No such reason existed in 1987.[7]

---

[6] The "Abbot Lab" note is inadmissible under Fed. R. Evid. 602, 802 and 805 to prove that Abbott held title to the Painting at any time, including in particular in 1987.

[7] The FBI investigated the matter, including interviewing Duncan, and determined in August 1992 that "there is insufficient evidence of a violation of federal law to warrant a continued investigation in this matter."  (Def. Ex. 162.) The FBI returned the questioned drawings to Evans (through Kaufman).  (*Id.*)

Kaufman acted in good faith and was a buyer of the Painting in the ordinary course in 1987.

<strong><u>CONCLUSION</u></strong>

Abbott knowingly dealt with an art merchant who sold the Painting to a buyer in the ordinary course.  Even assuming Abbott's prior ownership of the Painting, title to the Painting passed in July 1987 under N.Y. U.C.C. § 2-403(2).

Carol Feinberg owned and loved the painting in good faith for over 25 years, and she passed it down to her children upon her death.  The Court should find that her children are entitled to maintain this part of their mother's legacy, and should dismiss Abbott's replevin claim.

Dated:  New York, New York
       October 1, 2020                       PRYOR CASHMAN LLP

                                             By: _____
                                                 William L. Charron
                                                 Kaveri Arora
                                             7 Times Square
                                             New York, New York  10036
                                             (212) 421-4100
                                             *Attorneys for Defendants/Related Former Case-Plaintiffs Nancy Feinberg, Hope Feinberg Schroy and David Feinberg as Co-Executors for the Estate of Carol J. Feinberg*

20