UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABBOTT LABORATORIES, <br><br> Plaintiff, <br><br> -against- <br><br> NANCY FEINBERG, HOPE FEINBERG SCHROY, AND DAVID FEINBERG, AS CO-EXECUTORS FOR THE ESTATE OF CAROL J. FEINBERG, <br><br> Defendants. | Case No. 18-cv-8468 (LGS) <br><br> Hon. Lorna G. Schofield |

## ABBOTT'S RESPONSE TO DEFENDANTS' PRE-TRIAL MEMORANDUM OF LAW REGARDING THEIR AFFIRMATIVE ENTRUSTMENT DEFENSE

**Grossman LLP**
Judd B. Grossman
Lindsay E. Hogan
745 Fifth Avenue, 5th Floor
New York, New York  10151

**Patterson Belknap
Webb & Tyler LLP**
William F. Cavanaugh, Jr.
1133 Avenue of the Americas
New York, New York  10036

*Attorneys for Plaintiff
Abbott Laboratories*

Plaintiff Abbott Laboratories ("Abbott") respectfully submits this response to Defendants' October 1, 2020, Pretrial Memorandum of Law (Dkt. No. 139) supplementing their prior submissions regarding their affirmative entrustment defense (*see* Dkt. 130 at ¶¶ 331-55).  As the record at trial will demonstrate:  (1) Abbott did not entrust the Painting to an art merchant (*see* Dkt. No. 132 at ¶¶ 154-57); (2) R. Bruce Duncan is not the "alter ego" of Chicago Appraisers Association ("CAA") (*see id.* at ¶¶ 158-59; Dkt. No. 141); and (3) the Sibelius Corporation ("Sibelius") was not a buyer in the ordinary course (*see* Dkt. No. 132 at ¶¶ 160-86).  For each of these independently sufficient reasons, Defendants cannot meet their burden.

**The Entrustee Was Not an Art Merchant.**  New York courts have held generally that a merchant who "deals in goods of that kind" for purposes of the entrustment provision is "one who regularly sells those goods."  *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 515 (2d Cir. 2016) (holding celebrity stylist not a merchant who dealt in diamonds where there was no evidence that he regularly sold diamonds or other high-end jewelry).  Defendants cite evidence that Abbott acquired a single painting from CAA in 1988 as the sole support for their assertion that CAA, an art-appraisal company, was a merchant for purposes of the entrustment rule.  (*See* Dkt. No. 139 at 1-2.)  But Defendants must show that CAA *regularly* engaged in the business of buying and selling artwork, and the trial record will not support that finding.[1]

Apparently recognizing the dearth of evidence to support their claim that CAA actually was a merchant, Defendants instead focus on how Abbott may have "perceived" or viewed" CAA.

---

[1] Defendants again try to blame the passage of time for their evidentiary shortcomings.  But Defendants knew of CAA and Duncan for over a year after they learned of Abbott's claims, yet they sought nothing during that time, either on an expedited basis, or during the regular course of discovery.  (*See* Dkt. No. 132 at ¶¶ 83-84.)  And their claim that Abbott "never [tried] to elicit evidence from Duncan" (Dkt. No. 139 at 7-8) is demonstrably false, where Abbott has produced documents detailing interviews with Duncan as part of its investigation into thefts from its art collection.  (*See* Defs. Exs. 78, 140.)

(*See* Dkt. No. 139 at 4-5). But how someone at Abbott may have perceived CAA is not the relevant inquiry. The standard is whether, as a matter of fact, CAA *was* a merchant as defined under the U.C.C. (Dkt. No. 132 at ¶¶ 154-57.) And Defendants do not come close to meeting that burden.

**The Entrustee Did Not Sell the Painting.** Duncan, not CAA, sold the Painting to Sibelius. (*Id.* at ¶¶ 21-23.) The bill of sale from that transaction makes no mention of CAA whatsoever. (*Id.*) Faced with this uncontroverted evidence, Defendants simply conflate Duncan and CAA, referring to them interchangeably as "Duncan/CAA," and arguing that it would be "hyper-technical" for the Court to find a distinction between a person and a company.[2] (Dkt. No. 139 at 2.) But there is no legal or factual basis for finding that they were alter-egos for any purpose (*see generally* Dkt. No. 141), especially in light of the policy considerations underlying the narrow entrustment doctrine.

New York, with its "worldwide reputation as a preeminent cultural center," does not "encourage illicit trafficking in stolen art." *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 320, 569 N.E.2d 426, 431 (N.Y. 1991). New York law therefore historically has sought to "protect[] the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser." *Id.* at 317. The entrustment provision of the U.C.C. is an extremely narrow exception to this rule. Indeed, Defendants do not cite a single legal authority for their proposition that the entrustment provision can operate to give good title to a

---

[2] Defendants mischaracterize Evans's testimony in saying that "Duncan/CAA 'periodically' consigned art for sale through Christie's." (Dkt. No. 139 at 7.) To the contrary, Evans testified that she did not know whether Duncan consigned artworks to Christie's in his or CAA's name. (Pl. Ex. 106 at 126:13-20.) And there is no basis for Defendants' claim that "Duncan/CAA regularly sold and consigned art" to Evans and Sibelius (Dkt. No. 139 at 2), where all their transactions were with Duncan, personally, and the bills of sale do not mention CAA at all. (*See* Pl. Ex. 107 at 344:5-12 (Kaufman testifying that he never transacted business with CAA).)

buyer from anyone other than the entrustee.[3]

In cases where good-faith purchasers have sought to invoke the entrustment provision, New York courts have carefully scrutinized whether the entrustee was, in fact, the seller. In *Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 404–05 (S.D.N.Y. 2016), for example, the plaintiff sought a declaratory judgment that certain artworks belonged to him, while defendants asserted that an entity called Cerulean had acquired good title to the works from an art dealer under the entrustment rule. Overton argued that she had entrusted the artworks not to Cerulean's seller, but to two related entities controlled by the same principal. The Court held that there were factual questions as to which of the various entities was an entrustee, indicating that if the seller entity was not an entrustee, then the entrustment rule would not apply.[4] *See id.*

Similarly, in *Vanleigh Carpet Corp. v. Gene Schoor's Iron Forge*, 65 Misc. 2d 504, 505, 318 N.Y.S.2d 402, 404 (Civ. Ct. 1971), a carpet company's employee sold carpet to the defendant without permission, and then disappeared after personally receiving payment. The carpet company sent the defendant a bill, but the defendant refused to pay, arguing that it had already paid the employee. The court sided with the carpet company, citing U.C.C. § 2-403, holding that the loss should be borne by the buyer where he "understood that he was purchasing carpeting from [the employee] individually, and not as an employee of the [carpet company], and that [the buyer] further believed that he was acquiring something which [the employee] had the right to sell for his own account." *Id.*

---

[3] Defendants misread *Porter v. Wertz*, 5 N.Y.2d 696 (N.Y. 1981). (Dkt. No. 139 at 6.) The court there was clear that "subdivision (2) of section 2–403 of the Uniform Commercial Code is inapplicable for three distinct reasons: (1) even if Peter Wertz were an art merchant rather than a delicatessen employee, he is not the same merchant to whom Porter entrusted the Utrillo painting[.]" *Id.* at 699–700. In so holding, the Court recognized that the distinctness of the entrustee and seller is an independently sufficient ground for rejecting the entrustment defense.

[4] Defendants cite *Overton* for a general description of entrustment. (*See* Dkt. No. 130 at ¶ 334.)

Likewise, here, the record is crystal-clear—starting with the bill of sale itself—that Sibelius understood that Duncan was selling the Painting personally, not on behalf of CAA. (Dkt. No. 132 at ¶¶ 21-22.) The risk that Duncan was in fact a thief must be borne by Sibelius (and subsequent possessors, including Defendants), especially where Sibelius proceeded with the sale in the face of numerous red flags. (*See id.* at ¶¶ 24-31.)

**Sibelius Was Not a Buyer In the Ordinary Course.** During the relevant time period, Eric Kaufman had an art collection worth over $1 million, and he incorporated Sibelius just before the transaction involving this Painting as a vehicle for this and other deals with Duncan. (*See* Dkt. No. 132 at ¶¶ 162-64.) He was a sophisticated art investor who bought and sold art for profit; indeed, his own documents and testimony show that he actively marketed the Painting to multiple potential buyers before selling it just months after taking possession, and he made a nearly three-hundred percent profit. (*See id.* at ¶¶ 32, 166.) For these reasons, and especially where he was advised on the deal by Evans (herself an art dealer), Kaufman was required to undertake a heightened level of pre-sale diligence.[5] (*See id.* at ¶¶ 167-68.) Regardless, for several reasons, the Court need not reach the question of Kaufman's art-merchant status to find that Sibelius did not proceed with the sale in good faith:

1. Kaufman intentionally doctored the Painting's written statement of provenance (a) to conceal that Duncan was in the chain of title, and (b) to avoid disclosing the name of the gallery where Duncan claimed the unidentified—and in fact, nonexistent—prior owners had purchased the Painting, after the gallery had told Kaufman that it had no records of that sale. (Dkt. No. 132

---

[5] *See MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458, 459, 998 N.Y.S.2d 342 (2014), and *Levin v. Gallery 63 Antiques Corp.*, No. 04 CV 1504 KMK, 2006 WL 2802008, at *9 (S.D.N.Y. Sept. 28, 2006) (collectively standing for the proposition that parties in art transactions may be held to a higher standard of pre-sale diligence where they are sophisticated, or where they are represented by an experienced art dealer).

5

at ¶¶ 33-35.)  Defendants misstate the record by claiming that Evans, not Kaufman, prepared the fraudulent provenance statement.  (Dkt. No. 139 at 14.)  Although Evans, at Kaufman's request, prepared an insurance valuation also intentionally misstating the provenance (Pl. Ex. 39), Kaufman admittedly prepared at least one other incomplete provenance statement to try to market and sell the Painting (Dkt. No. 132 at ¶ 33-35).

2. The best evidence of market value is the price a willing buyer actually pays.  *See Arthur Properties, S.A. v. ABA Gallery, Inc.*, No. 11 CIV. 4409 LAK, 2011 WL 5910192, at *3 (S.D.N.Y. Nov. 28, 2011) ("By definition, the fair market value of an asset such as a work of art [] is the price that a willing buyer and a willing seller would agree to in an arm's length transaction[.]").  And here, $85,000 was obviously below the Painting's actual market value where just several months after acquiring the Painting from Duncan, Kaufman sold it for almost three times that amount.  (Dkt. No. 132 at ¶ 26.)  There is no evidence to support Defendant's bald speculation that the $250,000 sale price paid by Berry-Hill reflects nothing more than "a particularly eager buyer" (Dkt. No. 139 at 15-16), where the purchaser was a Manhattan art gallery literally in the business of selling art for profit.

3. Kaufman's own documents show that he understood that inquiry to a catalogue raisonné preparer would have been critical, yet he admittedly did not do so.  (*See* Dkt. No. 132 at ¶¶ 31, 36.)  While Defendants question whether Kaufman "should have gone to the Smithsonian" or to "Washington, D.C." to consult those papers (Dkt. No. 139 at 18-19), the McCausland Papers demonstrating Abbott's ownership of the Painting are part of the Archives of American Art, which has "had a presence in New York City since the late 1950s." *See* https://www.aaa.si.edu/news/new-york-research-center-officially-open.  So the absence of the internet in 1987 is irrelevant to whether Kaufman exercised proper pre-sale due diligence.

6

4.      That Kaufman continued to buy art for resale from Duncan *after* Evans uncovered Duncan's criminal conduct hardly "reflects Kaufman's good faith and honesty in fact."[6] (Dkt. No. 139 at 19.)  Indeed, at the very same time that Kaufman was representing Evans concerning serious "questions" about Duncan's forgery scheme, he purchased and then resold (through Sibelius) two other stolen Abbott paintings from Duncan.  (*See* Dkt. No. 132 at ¶ 40.)  And while Evans refunded all her clients who had purchased works from Duncan (*see* Pl. Ex. 106 at 37:14-40:6, 47:18-49:10), Kaufman, for his part, never disclosed the serious questions about Duncan to anyone, including the gallery to whom he sold the Painting.[7]

## **CONCLUSION**

CAA was not an art merchant.  CAA did not sell the Painting.  Sibelius was not a buyer in the ordinary course where it bought the Painting despite red flags that the sale "violate[d] the rights of another person in the goods."  Accordingly, the entrustment doctrine does not apply, and, therefore, Defendants never acquired good title to Abbott's stolen Painting.

---

[6] The record is clear that Kaufman did not contact the FBI on his own initiative, but at the behest of Evans, his then-client, who had incurred financial losses after refunding buyers of Duncan's forgeries.  (*See* Pl. Ex. 106 at 47:18-49:10.)

[7] Defendants make too much of the FBI's decision not to prosecute Duncan for his thefts.  Duncan was prosecuted, he pleaded guilty, and he was imprisoned for other federal crimes following the FBI's investigation.  *USA v. Duncan*, Case No. 90-cr-00076 (E.D.N.C.).

Dated: October 8, 2020
      New York, New York

                                       **GROSSMAN LLP**

                            By: */s/ Judd Grossman*
                                  Judd B. Grossman
                                  jgrossman@grossmanllp.com
                                  Lindsay E. Hogan
                                  lhogan@grossmanllp.com
                                  745 Fifth Avenue, 5th Floor
                                  New York, New York  10151
                                  (t): (646) 770-7445

                                  -and-

                                  William F. Cavanaugh, Jr.
                                  wfcavanaugh@pbwt.com
                                  **PATTERSON BELKNAP WEBB &**
                                  **TYLER LLP**
                                  1133 Avenue of the Americas
                                  New York, New York  10036
                                  (t): (212) 336-2793

                                  *Attorneys for Plaintiff*
                                  *Abbott Laboratories*