UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                            :
ABBOTT LABORATORIES,                        :
                              Plaintiff,    :          18 Civ. 8468 (LGS)
                                            :          19 Civ. 600 (LGS)
                -against-                    :
                                            :          FINDINGS OF FACT
NANCY FEINBERG et al.,                       :          AND CONCLUSIONS
                                            :               OF LAW
                              Defendants. :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

These are the Court's findings of fact and conclusions of law pursuant to Federal Rule of

Civil Procedure 52, following a three-day bench trial conducted by videoconference from

November 9 to November 11, 2020.  This case arises from a dispute over title to an oil painting

titled "Maine Flowers" (the "Painting") by American artist Marsden Hartley that was allegedly

stolen from Plaintiff Abbott Laboratories by an art restorer named Robert Bruce Duncan years

ago and replaced with a forged copy (the "Copy").[1]  Judgment is entered in favor of Plaintiff for

the reasons stated below.

**I.  Background**

Plaintiff is an Illinois corporation that maintains a corporate art collection of

approximately 200 works.  Defendants Nancy Feinberg, Hope Feinberg Schroy and David

Feinberg are co-executors of the estate of Carol Feinberg, who purchased Maine Flowers from

the Berry-Hill Galleries in New York in 1993 and purported to convey it to her estate upon her

recent death.

---

[1] The Court permitted the parties to refer only to the "Artist," "Painting" and "Copy" at trial to
prevent this title dispute from affecting the work's value by maintaining the identity of the artist
and the work confidential.  As these findings of fact and conclusions of law presumptively
resolve the title issue, and because numerous references were made to the artwork and its creator
by name at trial, the Court will do the same where necessary for purposes of clarity.

In 2002 and 2003, Carol Feinberg permitted the Painting to be publicly displayed at the Wadsworth Atheneum Museum of Art and the Berry-Hill Galleries, as recorded in newspapers from that time.  In 2016, after identifying the Copy as fraudulent, Plaintiff discovered these news reports, traced the Painting to Carol Feinberg, and requested its return.

In August 2018, after Plaintiff notified her of its claim to the Painting, Carol Feinberg initiated a declaratory judgment action in the Northern District of Illinois, seeking a declaration that she was the Painting's rightful owner.  Plaintiff filed the present action in September 2018, asserting a replevin claim and likewise seeking declaratory judgment.  In response, Defendants raised three affirmative defenses: (1) laches, which prevents Plaintiff from recovering the Painting if it unreasonably delayed in seeking the Painting's return from Defendants; (2) entrustment, which prevents recovery if Plaintiff gave the Painting to Duncan knowing that he dealt in art and might sell it; and (3) unclean hands, which prevents recovery if Plaintiff knew the Copy was a forgery but chose to sweep that fact under the rug.  In December 2018, the Illinois action was transferred to this District and consolidated with this case.  Defendants subsequently moved to apply the Illinois statute of limitations to bar Plaintiff's replevin claim.  The Court found New York law applicable under relevant choice-of-law principles.

The case proceeded to trial on the declaratory judgment and replevin claims.  The following witnesses testified at trial:

- Karmin Maritato, Plaintiff's Rule 30(b)(6) witness and the employee responsible for managing its art collection,

- Patrick Maxton, an archivist employed by Plaintiff,

- Lela Hersh, an art expert retained by Plaintiff from 2004 onward to help manage its art collection,

- Jamie Martin, owner of Orion Analytical, LLC ("Orion"), which performed a forensic analysis identifying the Copy as a forgery in 2016 and

- Eric Kaufman, who purchased the Painting from Duncan in 1987 and subsequently sold it to the Berry-Hill Galleries, which in turn sold it to Carol Feinberg.

In addition to these witnesses, the parties introduced deposition testimony of the following individuals:

- Wendy Hoff Evans, who helped broker the sale of the Painting from Duncan to Kaufman in 1987,

- Dr. John Driscoll, an expert on Hartley's works, who in 2003 opined that a photograph of the Copy appeared consistent with Hartley's work,

- Barbara Levin, an art appraiser, who coordinated authentication of Plaintiff's artworks in 2003 and obtained Driscoll's opinion, and

- Daniel Colin, Plaintiff's manager of investigations in 2003.

A number of potential witnesses were unavailable to testify at trial because they are deceased:

- Robert Bruce Duncan, who allegedly stole the Painting in 1987 and died in April 2019,

- Carol Feinberg, who died in October 2019,

- Robert Schoellhorn, Plaintiff's former CEO, who died in February 2017, Laurence Lee, Plaintiff's former general counsel, who died in January 2010 and Richard Ross, a former executive of Plaintiff, who died in December 1993 (Defendants claim these individuals were involved in a sale of the Painting prior to the 1987 theft alleged by Plaintiff),

- Ginger Harwell and William Pratt, two of Plaintiff's employees involved in management of its art collection in the 1980s, who died in February 2013, and June 2006, respectively,

- Luciano Liparini, an artist Defendants identify as the possible creator of the Copy, who died in March 1998 and

- Dr. John Driscoll, who died in April 2020 but as noted above was deposed.

Finally, at trial, the Court admitted 111 exhibits documenting the Painting's history, sales and appraisals.

## II.  Plaintiff's Replevin Claim

### A.  Elements of Replevin Claim and Summary Findings

Plaintiff seeks to recover the Painting through its replevin claim.  "A cause of action sounding in replevin must establish that the defendant is in possession of certain property of

which the plaintiff claims to have a superior right." *Melrose Credit Union v. Matatov*, No. 2017-09191, 2020 WL 6153560, at *3 (2d Dep't Oct. 21, 2020) (internal quotation marks omitted). Plaintiff bears the burden of showing, by a preponderance of the evidence, that it is lawfully entitled to possess the Painting and that Defendant has unlawfully withheld it. *See Solomon R. Guggenheim Found. v. Lubell*, 569 N.E.2d 426, 429 (N.Y. 1991) ("[A] cause of action for replevin against the good-faith purchaser of a stolen chattel accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it"); *accord Stewart Family LLC v. Stewart*, 126 N.Y.S.3d 107, 112 (1st Dep't 2020); *see also Smith v. Smith*, 121 N.Y.S.2d 626, 628 (1st Dep't 1953), *aff'd*, 308 N.Y. 665 (1954) (noting with approval jury instruction in replevin case that required factfinding by a preponderance of the evidence); *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 87 (2d Cir. 2013) (facts at civil trial must be established by a preponderance of the evidence).

Despite the passage of time and unavailability of some witnesses and other evidence, Plaintiff has met its burden of proving that it holds superior title to the Painting, specifically by showing that it is more likely than not that: (1) in 1960, Plaintiff purchased the Painting; (2) in 1987, the Painting was removed from Plaintiff's headquarters for restoration under the supervision of Duncan, through his company the Chicago Appraisers' Association ("CAA"); (3) Duncan had the Painting copied and returned the Copy to Plaintiff; (4) a few months later, Duncan sold the Painting to Kaufman via their mutual acquaintance Wendy Hoff Evans and (5) late in 1987, Kaufman sold the Painting to the Berry-Hill Galleries in New York, which then sold it to Carol Feinberg in 1993.

Defendants assert that Plaintiff did not sustain its burden of showing that Plaintiff has superior title to the Painting.  Defendants argue that: (1) Plaintiff's evidence is not sufficient to show that Plaintiff obtained valid title to the Painting in 1960; (2) even if Plaintiff held such title,

in 1983 the Painting may have been sold to Richard Ross, consistent with Plaintiff's practice of gifting or selling artworks in its collection to executives and/or (3) at some point prior to 1987, the Painting may have been transferred to or stolen by another individual at Plaintiff.  As explained below, Plaintiff's evidence is sufficient to sustain its replevin claim, even in the face of Defendants' contrary evidence and argument.

### B.  Plaintiff's Purchase of the Painting in 1960

The parties dispute whether Plaintiff held title to the Painting in the first instance.  The record shows it is more likely than not that Plaintiff obtained title to the Painting by purchasing it in 1960 from an art dealer named Albert Landry, who obtained it via the estate of an art dealer named Alfred Stieglitz following his death in 1946.  Numerous items of evidence of the Painting's provenance (i.e., its documented history), link the Painting and Hartley with Stieglitz, Albert Landry and Plaintiff.  First, Stieglitz, who was Hartley's agent for approximately thirty years and the primary exhibiter of his works, operated an art gallery named "An American Place," where he promoted and displayed Hartley's works through at least 1937.  Second, the Painting's reverse side (the "verso") contains a stamp reading "An American Place."  Third, the verso contains a stamp reading "Albert Landry Galleries."  Fourth, in 1961, the cover of Plaintiff's marketing magazine, *What's New*, featured a color photograph of the Painting and a reference to Albert Landry as Plaintiff's "Associate Art Director."  Fifth, Plaintiff's card catalog (later converted to a database) notes that the Painting was purchased from the Stieglitz estate via Albert Landry.  Sixth, Plaintiff's 30(b)(6) witness and collection manager, Karmin Maritato, credibly testified that Plaintiff's practice is and was to create such records only for artworks that it owns.  Based on this evidence, it is more likely than not that valid title proceeded through Hartley, Stieglitz and Albert Landry to Plaintiff.

Defendants first attempt to cast doubt on the reliability of Plaintiff's inventory card documenting the 1960 purchase, claiming that Maritato was unable to testify with specificity as to who prepared it, or her basis for claiming the information on the card was accurate.  However, Maritato's testimony as to Plaintiff's recordkeeping practices was thorough and credible, establishing that, based on her review of Plaintiff's documentation in her role as its primary art collection manager and 30(b)(6) witness, Plaintiff cataloged the provenance of artworks it purchased on such cards in the ordinary course of its business.  Even without Maritato's testimony, other record evidence suggests that the Painting came to Plaintiff through Albert Landry -- namely, the fact that Landry was listed as Plaintiff's associate art director on the 1961 edition of *What's New* bearing a copy of the Painting.

Defendants also note countervailing evidence suggesting that Stieglitz never held title to the Painting and therefore could not have passed valid title.  This evidence does not change the Court's finding that title more likely than not validly passed to Plaintiff in 1960.

First, Defendants point out that the Painting's verso is stamped "Property of Marsden Hartley" and contains an annotation identifying it as a part of Hartley's estate, presumably affixed at or after the time of Hartley's death in 1943.  Those annotations say little about whether Stieglitz, a long-time promoter of Hartley's work, held title to the Painting at the time of Stieglitz's death in 1946.

Second, the record contains an undated amendment to an agreement between the beneficiaries and trustees of Hartley's estate, purporting to add and omit certain artworks from the estate.  Defendants argue that this document, which appears in the collected papers of the trustee hired to liquidate Hartley's estate, G. Alan Chidsey (the "Chidsey Papers"), is a 1951 inventory of Hartley's estate.  This document contains numerous typed descriptions of Hartley's works, coupled with handwritten line-outs and annotations regarding whether and when each

was sold.  The document also contains various undated, handwritten entries for artworks.  One of those handwritten additions, presumably added on or after Chidsey's appointment as trustee in 1951, identifies an artwork named "Maine Flowers" as item "213B."  A second handwritten annotation lines through that entry.  A third handwritten annotation to the side of that listing states that the artwork was sold in 1960.  Defendants note that the Painting's verso bears the label "No. 213B of Hartley Estate catalogue."  From that, they posit that the Painting must have been in Hartley's estate on or after the time of the alleged 1951 inventory, rather than in the Stieglitz estate.

This document only weakly supports the inference that the Painting was present in Hartley's estate and cataloged in 1951, rather than with Stieglitz as Plaintiff claims.  It is not evident when or why the undated, handwritten annotation of "Maine Flowers" as "213B" was added to the Chidsey Papers.  The handwritten nature of the annotation suggests that the Painting was not in fact present at the time the inventory was conducted and the typed entries were made.  Nor is it clear that this addition -- made at some time after the original list was created and then lined out and annotated as sold -- was meant to signify that the Painting was in Hartley's estate, rather than disposed of via some other individual who held title to it.  Finally, the Chidsey Papers contain a contradictory record stating that the Painting, identified by a photograph and the name "Flowers," was sold in 1959, not 1960, to the Babcock Galleries in New York.[2]

---

[2] As discussed further below, a similar reference to a 1959 sale to the Babcock Galleries was noted in a 1987 search by Hoff of the Archives of American Art, a repository of dealer records, for information on the Painting.  That search also revealed that the Painting was recorded as belonging to Stieglitz, rather than remaining in Hartley's estate.  At trial, Kaufman reiterated what Hoff reported to him regarding the archives search, referencing notes he took at the time.  If introduced for the truth of the matter asserted -- that the Painting was at one point owned by Stieglitz and sold to the Babcock Galleries in 1959 -- this testimony is hearsay not subject to any exception.  Even if this evidence were considered, it would not support Defendants' claim that Plaintiff never held title.  Whether title to the Painting passed through the Babcock Galleries in 1959 does not suggest that it remained in Hartley's estate rather than passing to Stieglitz.  Nor does it affect the above-described circumstantial evidence linking the Painting with Stieglitz, the

It is also more probable than not that the artwork obtained by Plaintiff in 1960 was the original Painting and not a copy.  First, Defendants concede that "Abbott has evidence that it possessed the Painting, but Abbott's claims . . . are about the Painting's title."  Second, a leading expert on Hartley's work, Elizabeth McCausland, placed an annotation reading "Abbott Labs" next to a photograph of the Painting in a 1965 catalogue of Hartley's works ("catalogue raisonné").  Third, an art expert retained by Plaintiff to manage authentication of its collection, Lela Hersh, credibly testified as to two visible differences between the Painting and the Copy: a line on the original Painting is noticeably thinner than in the Copy, and the base of a depicted vase curves up in the Painting but not in the Copy.  These features of the original Painting are readily apparent in images of the Painting at the time of the purchase, such as the full-page image of the Painting in Plaintiff's 1961 *What's New* publication.  Plaintiff has met its burden of showing that it purchased and owned the original Painting in 1960.

### C.  Plaintiff's Loss of the Painting in 1987

It is more likely than not that Duncan took the Painting from Plaintiff and replaced it with the Copy in 1987.  Plaintiff used Duncan's company, CAA, for appraisal and restoration of its art collection.  Plaintiff's records show that the Painting was sent offsite for cleaning and a new liner sometime before July 31, 1987.  Invoices from that period show that Plaintiff paid CAA for restoration work, and no evidence suggests that the Painting was entrusted to a different entity for cleaning in 1987.  To the contrary, Maritato credibly testified that CAA was the only organization Plaintiff used for artwork cleaning services prior to 1989.  This evidence shows that it is more likely than not that the Painting was provided to CAA for cleaning in 1987.

---

Albert Landry Galleries and Plaintiff.  Indeed, the last entity identified as holding title to the Painting in Kaufman's notes is the Albert Landry Galleries, and those notes likewise identify the Painting as first belonging to Stieglitz's American Place gallery.

Plaintiff's primary contact at CAA was its president, Duncan, who "handled everything in the collection."  The parties do not dispute that in 1987, Duncan, who is deceased, approached Hoff in New York with an offer to sell the Painting.  Duncan made no mention of Plaintiff, instead representing that he had acquired the Painting from a woman or family that brought it to him for appraisal and that it previously had been held by the H.V. Allison Gallery.

This evidence provides strong circumstantial proof that Duncan took the Painting.  That conclusion is corroborated by Hersh's credible testimony -- which the parties do not dispute -- that four other works taken by Duncan for cleaning and restoration during this time period were later found to be forgeries.

Defendants suggest that title to the Painting may have passed to some third party in the 1980s, and then somehow passed from that individual to Duncan by 1987 when the Painting resurfaced in New York.  That argument is rejected because Defendants' evidence, discussed below, does not outweigh Plaintiff's evidence that Duncan stole the Painting.

The record shows that Plaintiff's recordkeeping as to its artworks in the 1980s was imperfect.  Hersh noted that Plaintiff's recordkeeping was inferior compared with that of museums but consistent with that of other corporations with art collections.  Defendants elicited evidence that Plaintiff had allowed employees to take paintings home and had sold paintings to employees.  At her deposition, Maritato noted that Plaintiff had commissioned painted reproductions of artworks like the Copy from scratch, but then clarified at deposition, and again at trial, that she had been mistaken and that Plaintiff had made only prints of its art collection. The latter claim was verified by Hersh and an Abbott archivist, Patrick Maxton, both of whom credibly testified that Plaintiff created only printed reproductions of its artworks, including a printed copy of the Painting that hung in the office of one of Plaintiff's former CEOs. Regardless of the manner in which any recreations of the Painting were made, this evidence

9

provides minimal support for Defendants' contention that Plaintiff ever gifted or transferred the Painting itself.

To further support their theory that the Painting was gifted or transferred, Defendants reference written records of two interviews in 2004 and 2012 that Plaintiff's director of security, Phil Stevenson, conducted with Duncan in the course of its investigations into forgeries in its collection. These documents are business records created in the ordinary course of Stevenson's work, thus excusing his absence as a witness.[3] However, Duncan's statements to Stevenson are hearsay within hearsay, offered for the truth of the matter asserted, not subject to any hearsay exception, and thus inadmissible. Duncan's statements are not admissible under the residual exception to the hearsay rule, Rule 807, because they are inherently untrustworthy coming from Duncan, who likely stole several of Plaintiff's paintings.

The record also shows that in 1983, Plaintiff's executive, Richard Ross, asked to buy the Painting. Plaintiff's CEO, Robert Schoellhorn, and general counsel, Laurence Lee, had the Painting appraised and offered it to Ross for $30,000. An exhibit from Plaintiff's corporate archives appears to summarize documents purportedly in a folder pertaining to the Painting. The exhibit states that the file contains "correspondence regarding the purchase of the 1983 purchase of [sic] this painting by employee Dick Ross." That exhibit either describes documents that were never found in the litigation showing that Ross actually purchased the Painting, or -- more likely -- mistakenly characterizes the offer to Ross as evidence of his purchase. Circumstantial evidence shows that Plaintiff did not act in a manner consistent with having transferred the

---

[3] The documents report what Duncan reportedly told Stevenson regarding Plaintiff's treatment of its art collection in the 1980s, including that: (1) Plaintiff's management of its art collection was chaotic; (2) the collection was an unspoken bonus program for retiring Abbott executives; (3) one of Plaintiff's employees told Duncan that if a painting were lost or stolen, Abbott was self-insured and would not have to report to anyone; and (4) he (Duncan) was discouraged from asking about the authenticity of paintings or Plaintiff's recordkeeping.

Painting: Plaintiff's records show that it continued to send the work out for appraisal and cleaning after 1983.  Maritato credibly testified that Plaintiff created records of the gifting or sale of its artworks to employees, but there is no record of any sale of the Painting to Ross.  That Ross once expressed interest in purchasing the Painting does not contradict the strong evidence that Duncan more likely than not stole the Painting from Plaintiff in 1987.

Finally, the Copy is marked differently than the Painting; its verso contains a handwritten inscription, "by Marsden Hartley," not in Hartley's handwriting, and is titled "Maine Flowers II."  Plaintiff first created a record identifying the Copy by this title in 2007 and continued to do so thereafter.  Hersh opined that the new title and inscription, coupled with the above-described facially evident differences between the Painting and the Copy, indicate that that the Copy likely was made without the intent to deceive.  Hersh likewise identified one individual who could have made such a copy for Plaintiff -- a painter named Luciano Liparini, who is deceased.  Hersh's statements that the Copy was not intended to be a forgery thus support Defendants' argument that Plaintiff had a practice of creating copies of works in its collection.  Nevertheless, the most plausible inference under the circumstances is that the person who created the Copy did so without malintent, but an unscrupulous individual replaced the Painting with the Copy.  Consequently, the title "Maine Flowers II," the inscription "by Marsden Hartley" and the obvious differences between the Painting and the Copy do not alter the Court's conclusion that Duncan more likely than not took the Painting and replaced it with the Copy.

### D.  Duncan's Sale of the Painting in 1987

After Duncan approached Hoff with an offer to sell the Painting in 1987, she contacted Kaufman, with whom she had previously coordinated art deals, to arrange a meeting with Duncan.  Kaufman's art collection experience to that date had not involved American works like the Painting.  He asked Hoff, who had worked as an appraiser at Christie's auction house, to

check the Painting's history in the Archives of American Art.  Hoff's search of that archive revealed that the Painting was recorded as belonging to Stieglitz's American Place gallery and sold to the Babcock Galleries in 1959.  By contrast, when Duncan spoke to Kaufman, he represented that he had acquired the Painting from a woman or family that brought it to him for appraisal and that the Painting previously had been held by the H.V. Allison Gallery.  Kaufman then commissioned a UCC search for outstanding liens on the Painting, which returned no results.  He also consulted with the International Foundation for Art Research ("IFAR"), an organization that maintained records on art thefts and malefactors in the art business.  IFAR reported that it had no records on Duncan and no record of the Painting being stolen.  Kaufman also checked with the H.V. Allison Gallery, which reported that, while it had no explicit records going back very far concerning such a painting, a sale of a painting by Hartley was consistent with the kind of business it was doing at the time.

Duncan and Kaufman settled on a purchase price of $85,000, which Kaufman credibly testified represented the difference between Duncan's asking price of $100,000 and a top-value appraisal of $70,000 by Christie's auction house.  Hoff subsequently obtained an insurance appraisal for the Painting at $275,000, matching Kaufman's expected asking price for the Painting.  Kaufman credibly testified that this asking price, although higher than the $85,000 purchase price, was consistent with the idiosyncratic nature of art markets and the wealth and tastes of art purchasers.  In support of the insurance appraisal, Kaufman provided a provenance of the Painting, which listed neither Duncan nor the H.V. Allison gallery Duncan claimed the Painting had passed through.

Kaufman first offered the Painting to an individual for $275,000, stating in his offer letter that any sale would "be kept in strict confidence and not pursued through these or other sources unless we discuss it in advance.  If we get to a stage where you feel additional information or

verification is important to a transaction, I am sure we will be able to arrive at a mutually satisfactory manner of obtaining it."  As Kaufman credibly explained at trial, this language was included to preserve the value of the Painting, which was new to the New York art market, by preventing details of price negotiations in unsuccessful sales from affecting future potential buyers.

After this first prospect rejected Kaufman's offer, Kaufman offered the Painting for $350,000 to Berry-Hill, which he credibly described as an inflated bid to open negotiations. Kaufman ultimately sold the Painting to Berry-Hill for $250,000, with the proceeds going to the Sibelius Corporation, an entity Kaufman created for his commercial art transactions.  Kaufman and Hoff split the proceeds of the sale, and Kaufman prepared an indemnity for a sale of this value, which Kaufman credibly testified that Hoff signed in 1988.[4]  After the sale to Berry-Hill, Kaufman added handwritten annotations to a typed draft provenance of the Painting provided to him by that gallery, but again did not include Duncan, the H.V. Allison Gallery or the unidentified person from whom Duncan claimed to have acquired the Painting.

In 1991, Kaufman on behalf of Hoff registered a complaint with law enforcement that certain charcoal drawings that Duncan had sold to Hoff were fraudulent.  Kaufman and Hoff both testified that they did not have any suspicion about the Painting at that time.

### E.  Plaintiff's Discovery of the Loss

In 2002 or early 2003, an appraiser retained by Plaintiff noted irregularities in a French artwork in Plaintiff's collection that suggested it was a forgery.  Plaintiff subsequently engaged Barbara Levin to coordinate authentication of various artworks in its collection.  Levin identified

---

[4] Hoff's testimony at her deposition, designated for inclusion in the trial evidence, is that she had no recollection or understanding of the indemnity.  She stated "it looks like my signature, but I sign a lot of things."  In response to the question whether it was possible someone forged her signature, she replied "It's possible."

several works that required priority treatment based on their appraised value, including the Painting. Levin also identified experts on the relevant artists. For the Painting, Levin engaged Dr. John Driscoll of Babcock Galleries, a leading scholar on Hartley who had authenticated Hartley's works in the past. Driscoll requested mailed photographs of the Copy but did not initially ask to see the Copy in person, testifying that he understood the authenticity of the Copy to be in doubt, but that travel for inspection purposes was an "expensive proposition." In 2003, Driscoll responded in writing to Levin: "Based on your photographs, it appears that your painting entitled MAINE FLOWERS is consistent with paintings by Marsden Hartley. We are very interested in seeing the painting in person to confirm our opinion of the above." Driscoll continued, "Babcock Galleries acquired the estate of Marsden Hartley more than 40 years ago, and I believe that we have sold more Hartleys than any other gallery. In the event that a decision is being made in the future to bring the painting into the marketplace, we would be pleased to discuss how we could be of assistance to you." At his deposition (but not in his letter to Levin), Driscoll, who is deceased, stated that: (1) authenticity judgments based on photographs are not reliable; (2) a statement that a work of art is "consistent" with an artist's other works meant he was "not sure" of authenticity but that, "barring the discovery of some other evidence that [a work] is probably by the artist"; (3) to provide a definitive authentication opinion he would "want to see the painting"; and (4) to his trained eye and based on photographic images, the Copy was obviously different from the Painting.

Plaintiff took no other action to authenticate the Copy after receiving Driscoll's letter but continued its efforts to identify other artworks that were potentially forgeries. In 2005, Hersh prepared a report for Plaintiff identifying seven artworks by French artists in Plaintiff's collection that were suspected forgeries. Similarly, in 2013, after an art appraiser identified another potential forgery, Plaintiff again engaged Hersh to coordinate authentication of high-

14

value artworks in its collection.  Hersh identified four additional works, three French and one American (which was not the Copy), to be sent to Orion, a firm specializing in forensic inspection and authentication of artworks.

Hersh testified that in 2005, and again in 2013, she did not feel the need to further investigate the Copy.  She first noted that, for the forgeries identified to date, the forger had provided new frames and had not placed the labels from the old frame on the new frame, whereas the Copy still had its period frame and original labels.  She credibly stated that the manner in which paint was applied to the Copy would have been difficult to mimic, thus lowering the chance of the artwork being a forgery.  Additionally, she noted that the Painting was less valuable than the other artworks suspected of being forgeries.

Regarding Driscoll's letter stating that the photograph he viewed was "consistent with" Hartley's work, Hersh stated that although Driscoll had requested to see the work in person, she understood that request to be an overture to brokering a sale of the Painting rather than an expression of serious doubt as to the Painting's authenticity.  Hersh also credibly testified that American art authenticators generally use vague language of the sort employed by Driscoll, rather than outright stating that an artwork is or is not authentic.

In 2016, Hersh recommended Plaintiff also send the Copy to Orion for forensic analysis. At trial, she struggled to articulate her rationale for doing so in light of her above-stated reasons for believing the Copy was authentic, stating that Plaintiff "might as well," given that it was already sending the other works, but that she "[didn't] know" and was "not sure" of why she did so.

In a report dated March 31, 2016, Orion reported that the Copy was a forgery, as it contained a polymer ground layer introduced in the 1950s, thus post-dating the Painting's creation in 1936.  Orion also reported that the back of the Copy had been deliberately abraded

and toned to appear aged.  In a subsequent report dated April 1, 2016, Hersh listed the Copy as a forgery alongside several other of Plaintiff's artworks.  That report also contains a table listing each artwork, with a column titled "Positive connoisseur authentication."  For some of the forged artworks, that column contains the annotation "Y."  For others, it contains "N."  And for others, like the Copy, it contains "NA."  In a separate section of that report discussing the Copy, Hersh stated that it was "Not authenticated by connoisseur."  At trial, Hersh variously testified that these items in her report were typos or mistakes, and that she was unsure of why she added them. Hersh otherwise testified that she felt she had a "very strong" authentication of the Copy from Driscoll.  Although Hersh's testimony at trial was generally credible as to whether she entertained serious doubts as to the Copy's authenticity, the evidence supports a finding that Plaintiff did not obtain a definitive authenticity opinion from Driscoll.

Based on the above findings of fact, Plaintiff has proved its replevin claim by a preponderance of the evidence, showing that it holds superior title to the painting.  It is undisputed that Plaintiff made a demand to Carol Feinberg, who possessed the Painting, and that Ms. Feinberg refused the demand.

## III. Affirmative Defenses

"An affirmative defense is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.'"  *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (alteration in original) (quoting *Black's Law Dictionary* 451 (8th ed. 2004)).  In response to Plaintiff's replevin claim, Defendants raise affirmative defenses of laches, entrustment and unclean hands.

### A.  Defendants' Laches Defense

"Laches is an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party."  *Reif v. Nagy*, 106 N.Y.S.3d 5, 22 (1st Dep't 2019),

*leave to appeal dismissed*, 148 N.E.3d 540 (N.Y. 2020) (internal quotation marks omitted).

Whether to permit a defense of laches is within the trial court's discretion. *See Chevron U.S.A., Inc. v. Comm'r of Envtl. Conservation*, 927 N.Y.S.2d 452, 454 (3d Dep't 2011). The essential element of laches is prejudice, *see In re Flamenbaum*, 1 N.E.3d 782, 784 (N.Y. 2013), which "may be demonstrated by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay," *Reif*, 106 N.Y.S.3d at 22 (internal quotation marks omitted). As such, "[t]he mere lapse of time, without a showing of prejudice, is insufficient to sustain a claim of laches." *Id.* (collecting cases). But actual knowledge of a claim is not required; rather, it is sufficient that a party, such as Plaintiff here, should have known that it could bring a claim. *See Philippine Am. Lace Corp. v. 236 W. 40th St. Corp.*, 822 N.Y.S.2d 25, 27 (1st Dep't 2006). The possessors of an artwork -- here Defendants -- bear the burden of establishing laches. *See Flamenbaum*, 1 N.E.3d at 784. Finally, in declining to apply laches to bar a replevin claim for an artwork, a New York intermediate appellate court recently observed that "New York has a strong public policy to ensure that the state does not become a haven for trafficking in stolen cultural property, or permitting thieves to obtain and pass along legal title." *Reif*, 106 N.Y.S.3d at 24.

### 1.   Whether Plaintiff Should Have Recognized the Theft Prior to 2016

The parties dispute whether Plaintiff unduly delayed in asserting its claim to the Painting because it should have recognized the Copy was a forgery prior to 2016.

#### a.   Whether Plaintiff Should Have Recognized the Theft in 1987

Defendants have not met their burden of showing that Plaintiff should have recognized the Copy as inauthentic when it was returned in lieu of the Painting following the 1987 cleaning. As Hersh credibly testified, it is not standard practice to check an artwork for changes following restoration because "the whole point of conservation is to make it look better, it's to remove the

varnish or the bunch of embedded dirt and clean up the cracks and make it prettier and it looks different." Nor has either party introduced any evidence that in 1987, Plaintiff had any reason to believe that forgeries were being substituted for its artworks sent out for cleaning and restoration. Rather, as Hersh noted, instances of such substitution are rare.

### b. Whether Plaintiff Should Have Recognized the Theft After Receiving Driscoll's Letter

Defendants have not met their burden of showing that Plaintiff should have recognized that the Copy was inauthentic after receiving Driscoll's letter stating that a photograph of the Copy was "consistent with" works by Hartley, requesting to see it in person "to confirm" that opinion and offering to broker a sale. Although Driscoll testified at his deposition that he did not mean to provide a certain authentication, but instead only an indication that the Copy was "probably" by Hartley barring any other evidence to the contrary, that testimony says little about what Plaintiff could reasonably have interpreted his words to mean. Hersh credibly testified that oblique language like Driscoll's was consistent with the manner in which American art appraisers expressed their opinions as to authenticity, and that offers to view a painting were as much an expression of interest in brokering a sale as a request for further authentication information.[5] Defendants did not offer any expert or other testimony to contradict Hersh's view.

So, although one reason Driscoll was interested in seeing the Painting in person was to further substantiate his opinion that the Copy was "consistent with" Hartley's works, that expressed interest does not detract from his prior consistency finding. Also, at the time, Plaintiff was considering other evidence suggesting that the Copy was not likely a forgery -- it was in its original frame, bore its original labels, was less valuable than the other works Plaintiff was

---

[5] Barbara Levin -- the appraiser who received Driscoll's letter in the first instance in 2003 prior to Plaintiff's retention of Hersh -- stated in testimony designated for use at trial that she forwarded Driscoll's letter to Plaintiff without commentary, and did not provide any further opinion on authenticity.

investigating and its style made it difficult to forge.  Based on that information and Driscoll's statement, Plaintiff reasonably concluded that no further investigation of the Copy was warranted.

Defendants claim Plaintiff unduly relied on Driscoll's letter in determining that no further investigation was needed.  In support of that argument, they note Hersh's contradictory statements at trial: that she (1) believed Driscoll's letter was a "very strong" authentication; (2) was confused and/or mistaken in annotating the Painting as "NA" and "Not authenticated by connoisseur" in her 2016 report and (3) was unsure as to why she ultimately recommended Plaintiff send the Painting to Orion for analysis, but felt that she "might as well" given that Plaintiff had already established a relationship with Orion.  This testimony plausibly suggests that Hersh did not find Driscoll's letter a conclusive authentication of the Copy.  That suggestion does not alter the fact that Plaintiff did have evidence strongly suggesting the Copy was authentic:  Driscoll's statement that it was "consistent with" Hartley's works and the circumstantial indicia of authenticity discussed above.

Defendants also fault Plaintiff for not comparing the Copy to the image of the Painting on the 1961 *What's New* cover in the early 2000s.  Although Hersh testified that comparison of a suspected copy to early images of a work is a useful means of detecting forgeries, Maritato credibly testified that Plaintiff instead chose to consult with Driscoll.  The need for comparison to the *What's New* cover was also lessened by the above-discussed evidence suggesting the Copy was authentic -- the original frame and labels, the low value of the work relative to the other suspected forgeries and the difficulty of copying its style.  Although in hindsight a comparison to the *What's New* cover likely would have revealed the Copy to be a forgery, Plaintiff's failure to conduct that comparison does not carry Defendants' burden on its laches defense.  Instead, the picture that emerges from the record is of a party that took immediate action upon learning that it

19

had a forgery in its collection, including an evaluation of the Copy by a recognized expert, which Plaintiff (1) reasonably interpreted as one indication the Copy was authentic and (2) considered alongside other evidence suggesting authenticity.

### c. Whether Plaintiff Should Have Recognized the Theft Because the Copy Was Marked "Maine Flowers II"

As described above, in 2007, Plaintiff's records began listing the Copy as "Maine Flowers II," consistent with the inscription on its verso. Various records from 2007 onward contain this title, including a 2011 conservation report for the Copy reviewed by Hersh. Hersh's 2016 report noted the "II" as one indication -- coupled with the inscription "by Marsden Hartley" on the verso, and the obvious differences between the Painting and the Copy -- that the Copy was not authentic. From that statement, Defendants suggest that, as early as 2007, Plaintiff should have immediately suspected the Copy's inauthenticity and further investigated it. This argument is unpersuasive. Hersh's report was created following Orion's identification of the Copy as a forgery. As Hersh credibly explained at trial, the significance of the "II" became apparent only in hindsight, after she learned of scientific evidence identifying the forgery.[6] That testimony is strengthened by Hersh's explanation that it is not uncommon for confusion to exist about the proper names for artworks, or for art galleries to add inscriptions and annotations to paintings they hold. Similarly, Maritato noted that the "II" reflected confusion about the Painting's proper title, rather than the presence of a forgery. Again, the other evidence in Plaintiff's possession at the time -- Driscoll's letter, the original frame and labels, the low value of the Painting relative to the others suspected of being forgeries at the time and the difficulty of copying Hartley's style -- suggested authenticity. Consequently, Plaintiff cannot be faulted in hindsight for failing to

---

[6] Hersh's 2016 report followed Orion's report by one day, but Hersh credibly testified at trial that she understood Orion's assessment of the Copy as a forgery at the time she wrote her report.

initiate a new investigation into the Copy based solely on records documenting it as "Maine Flowers II" from 2007 onward.

Defendants also argue that the "II" should have been discovered in 1987, as Maritato testified that Plaintiff's practice has always been to verify that the name on an artwork returned from restoration matches the artwork sent. If Plaintiff performed this check on the Copy in 1987, the "II" was not flagged as anomalous, as Plaintiff's records through 2007 list the Copy as "Maine Flowers." Regardless, for the same reasons as above, this discrepancy, standing alone, did not create an obligation for Plaintiff to investigate the Copy sufficient to sustain Defendants' laches defense.

### 2.  Whether Defendants Are Prejudiced

Because Plaintiff did not unduly delay in bringing its replevin claim, Defendants' laches defense cannot stand, and it is unnecessary to reach the question of prejudice. Nevertheless, Defendants cannot show that they were prejudiced by the passage of time between the theft in 1987 and the initiation of this action in 2018. Defendants' primary argument is that "all the key witnesses and much of the necessary documentation are gone."

Defendants first claim that starting in 2003 -- when Plaintiff first came to suspect its collection contained forgeries -- Plaintiff did not preserve applicable records that would have shed light on the Painting's disposition. Defendants identify no such documentation. Nor is there any evidence that relevant documentation was lost or destroyed in or after 2003. Thus, the documents available to Defendants in 2003 are likely the same as today, and Defendants provide no reason to conclude otherwise. *See Hopkins v. Alcas Corp.*, 880 N.Y.S.2d 754, 757 (3d Dep't 2009) (finding no prejudice where a party "offer[ed] nothing more than speculation" of evidence supporting an affirmative defense).

Defendants also claim that they were prejudiced by Plaintiff's failure to obtain evidence from individuals with first-hand knowledge of the Painting's disposition who are now deceased. First, this assertion is not entirely true, as Defendants attempt to rely in part on two interviews Plaintiff conducted with the most significant deceased witness in this case -- Duncan.  Second, although several such potential witnesses -- Schoellhorn, Harwell, Lee, Duncan and Pratt -- were alive in 2003 and thus could have been directly questioned and cross-examined at that time, Defendants do not explain how any testimony from these witnesses would contradict the factual record in this case which, although not exhaustive from 1960 to 1987, contains strong circumstantial evidence that Plaintiff obtained the Painting in 1960 and lost it to Duncan in 1987. Although testimony from these deceased individuals certainly would have been useful, the absence of those witnesses does not carry Defendants' burden of demonstrating prejudice, particularly in light of the documentation and witnesses available in this proceeding.

Defendants also rely on *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 194 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1269 (2020).  There, the Second Circuit found unreasonable delay and prejudice where a prior owner of a painting filed suit in 2016 because: (1) the painting was a famous "masterwork" by Picasso, not an "obscure piece of art"; (2) it was prominently on display at New York's Metropolitan Museum of Art for several decades; (3) the prior owner's family had been listed in the painting's provenance for fifty years; and (4) there were "no witnesses" who could testify as to plaintiff's claim that the work was sold under duress in 1938 to fund flight from Europe due to heightened anti-Semitic activity.  *Id.* at 194–96.  Here, by contrast, there are verified corporate records and circumstantial evidence showing that title to the Painting, which neither party claims is a major work by a popularly known artist, passed validly to Plaintiff in 1960.  There is likewise documentary and circumstantial evidence showing that Plaintiff gave the Painting to Duncan for restoration in 1987.  There is also thorough first-hand

witness testimony regarding Duncan's sale of the Painting shortly thereafter from Kaufman and Hoff. Finally, there is fulsome documentation and testimony as to Plaintiff's investigative efforts from 2003 onward. As such, this case does not suffer from the evidentiary void that led to a finding of unreasonable delay and prejudice in *Zuckerman*. Nor does this case present the lack of competent evidence and half-hearted investigative efforts following discovery of a lost artwork present in the other cases Defendants rely on. *See Bakalar v. Vavra*, 819 F. Supp. 2d 293, 305 (S.D.N.Y. 2011), *aff'd*, 500 F. App'x 6 (2d Cir. 2012) (family made no effort to locate property lost to Nazis until 1998); *Sanchez v. Trustees of the Univ. of Pennsylvania*, No. 04 Civ. 1253, 2005 WL 94847, at *3 (S.D.N.Y. Jan. 18, 2004) (family made no efforts to locate stolen artwork for thirty-two years after learning of theft, other than occasionally walking through art galleries); *In re Peters*, 821 N.Y.S.2d 61, 69 (1st Dep't 2006) (plaintiff waited seventy years after learning of alleged conversion of artwork); *Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.*, 752 N.Y.S.2d 295, 297 (1st Dep't 2002) (family waited 50 years to seek return of painting after withdrawing claim against German government in 1960). As such, Defendants have not met their burden of showing they were prejudiced by the passage of time in this case.

## B. Defendants' Entrustment Defense

The defense of entrustment, codified at N.Y. U.C.C. § 2-403(2), prevents a party from recovering an item knowingly entrusted "to a merchant who deals in goods of that kind" if the merchant subsequently sells that item to a buyer in the ordinary course of business. "The theory behind the provision is that a person who knowingly delivers his property to a merchant dealing in goods of that kind assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser." *Galin v. Hamada*, 283 F. Supp. 3d 189, 195 (S.D.N.Y. 2017), *aff'd*, 753 F. App'x 3 (2d Cir. 2018) (internal quotation marks omitted). Defendants claim that when Plaintiff transferred the Painting to CAA for cleaning in 1987, Plaintiff was

entrusting it to Duncan, whom Plaintiff knew to be a merchant in artworks. Defendants claim that Duncan subsequently sold the Painting to Kaufman in the ordinary course of business, and thus that Plaintiff cannot now recover it. Defendants bear the burden of proving this affirmative defense by a preponderance of the evidence. *See Galin v. Hamada*, No. 15 Civ. 6992, 2016 WL 2733132, at *2 (S.D.N.Y. May 10, 2016) (citing *United States v. Cont'l Ill. Nat. Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1253-54 (2d Cir. 1989)).

Defendants have not carried their burden of proving the elements of entrustment. The record shows that Plaintiff had no knowledge that either CAA or Duncan was an art merchant in 1987; rather, as described above, Plaintiff engaged CAA and Duncan exclusively for art appraisal and restoration. *See Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 521 (2d Cir. 2016) (applying New York law to conclude that a "merchant" under N.Y. U.C.C. § 2-403(2) is someone who deals in goods of the kind entrusted, rather than a person who otherwise transacts business in the relevant industry). Nor does the record contain any evidence showing that Duncan or CAA was engaged in the business of buying and selling art in 1987. The only evidence related to such an inference are documents showing that Plaintiff purchased an item of art from CAA through Duncan in 1988, after the loss of the Painting. It is more likely than not that when Plaintiff turned the Painting over to CAA for cleaning in 1987, it was not knowingly entrusting the Painting to an art merchant who might sell it. Nor is there any record evidence that Duncan was acting as CAA's agent when he sold the Painting to Kaufman; to the contrary, the bill of sale prepared for the Painting makes no mention of CAA. Accordingly, Defendants have not met their burden for their entrustment defense.

### C.  Defendants' Unclean Hands Defense

"The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the

conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." *Citimortgage, Inc. v. Heyman*, 131 N.Y.S.3d 95, 98 (2d Dep't 2020); *see also* 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2946 (3d ed. 2020) ("since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff."). Defendants argue that Plaintiff's conduct was in bad faith because: (1) its executives disposed of the Painting in the 1980s without proper documentation or (2) Plaintiff learned of the Copy and "decided to quietly sweep the matter under the rug." Neither of these assertions is supported by the record. As discussed above, the preponderance of the evidence shows that Duncan, not one of Plaintiff's executives, took the Painting. Similarly, the evidence shows that Plaintiff took reasonable steps to investigate the Copy's validity and acted promptly upon discovering the forgery. The benefit of hindsight makes it easy to fault Plaintiff for not taking various specific steps that might have revealed the forgery sooner. But those observations do not obviate Plaintiff's demonstrated diligence in attempting to authenticate the Painting, much less support Defendants' claim that Plaintiff actively attempted to conceal the forgery. Defendants' unclean hands defense fails.

## IV. Conclusion

For the reasons set forth above, Plaintiff has demonstrated that it has superior title to Maine Flowers, and thus prevails on its declaratory judgment and replevin claims. Plaintiff has marketable title to Maine Flowers, free of any claims by Defendants. The Clerk of the Court shall enter judgment for Plaintiff.

Dated:  December 9, 2020
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE